UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GITI KARIMPOUR,<br><br>   Plaintiff,<br><br>   v.<br><br>MATTHEW CATE,<br><br>   Defendant. | Case No. 11-cv-06356-WHO<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Re: Dkt. No. 3 |

## INTRODUCTION

Giti Karimpour filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging her 2008 convictions in Santa Clara County Superior Court. Karimpour asserts that she merits habeas relief because her trial counsel provided constitutionally ineffective assistance by failing to either consult with a medical expert or call one to testify at trial, and that the California Court of Appeal unreasonably applied clearly established federal law when it held the trial counsel's performance was neither deficient nor prejudicial. For the reasons discussed below, Karimpour's petition is DENIED.

## BACKGROUND

On January 4, 2008, a jury in Santa Clara County Superior Court convicted Karimpour of committing child abuse against two infants at the daycare center she owned and operated.[1] The trial court sentenced her to three years and four months in prison. The following factual

---

[1] Karimpour was charged with two counts of child abuse in violation of California Penal Code section 273a, subsection (a). *People v. Karimpour*, No. H033312, 2010 WL 2768934 at *1 (Cal. Ct. App. Jul. 14, 2010). Defendant was convicted on both counts. *Id.* Count one included an enhancement under California Penal Code section 12022.7(d) for causing great bodily injury. *Id.* Although the jury found true the great-bodily-injury allegation, the trial court subsequently dismissed the enhancement "in furtherance of justice." *Id.*

background, presumed to be correct under 28 U.S.C. § 2254(e)(1), is excerpted from the California Court of Appeal's decision. *See Karimpour*, 2010 WL 2768934 at *1-14. Karimpour does not contest the accuracy of these factual findings and admits they must be presumed correct under 28 U.S.C. § 2254(e)(1). *See* Traverse at 1.

**A. Prosecution Case**

The parents of G.M. and J.G.[2] were clients of Giti's Home Daycare, defendant's child daycare business. G.M. was less than a year old while in defendant's care, and defendant began to care for J.G. from the age of three months until he was almost two years old.

**1. Count One: G.M.**

G.M. began to attend Giti's Home Daycare in November of 2006 at the age of six months. On the evening of February 5, 2007, after bringing G.M. home from the facility, his mother discovered that he had two painful bruises on the side of his head. His legs, however, were fine and he was playing and acting normally that evening and early the next morning before being taken to the daycare facility.

On that next morning, as G.M.'s mother delivered G.M. to the facility, she asked defendant how he had become bruised, and defendant said she did not know.

That afternoon G.M.'s mother went to collect G.M. and immediately detected that he "was not his normal happy self." Defendant handed G.M. to his mother. G.M. was "screaming uncontrollably" and "hysterical" as if in "extreme pain." He failed to recognize his mother. Defendant said that earlier that afternoon another child had knocked G.M. over, causing G.M. to bump his head, and that G.M. had been in distress since then.

Throughout that night G.M. continued to show signs of extreme pain, particularly when his mother manipulated his legs. Early the next morning G.M.'s mother telephoned defendant to ask whether anything had happened to his legs the day before and defendant repeated that G.M. had bumped his head, but that was all. G.M.'s mother took him that day to the Stanford University hospital emergency room, where doctors discovered that he had a spiral fracture of the femur, which could be caused by a twisting of the leg. The hospital notified law enforcement authorities.

[…]

**2. Count Two: J.G.**

---

[2] In compliance with Federal Rule of Civil Procedure 5.2(a), the names of minors have been replaced with their initials throughout this excerpt.

J.G. was three months old when he began attending Giti's Home Daycare in 2005. On December 19, 2006, he was 21 months old. His mother went to collect him from defendant that day, and before his mother gathered him from a sleeping room, defendant told her, without rancor and perhaps even in a bemused tone, that J.G. had been misbehaving - he had refused to eat and she had had to force him to do so. When J.G.'s mother went to the sleeping room, she found him whimpering, moaning, and drooling continuously. His mother noticed scratches and bruises on both sides of his face. At this point he became agitated and was crying, and he could not close his mouth, eat, or drink. J.G.'s mother asked defendant to explain the situation, and she replied that she was feeding him with a spoon and he turned his head and bumped it on a bookcase. J.G.'s mother left feeling panicky. She took him directly from Giti's Home Daycare to the Palo Alto Medical Foundation, where a pediatrician examined the drooling and crying child and discovered fresh puncture marks on his face and in the back of his throat. The marks were aligned as if made by the tines of a fork. The treating pediatrician testified that "a perforation of the area back there" can amount to a "serious injury" because "[t]here's several vital structures surrounding the oropharynx" that was injured, "several major veins and arteries to the side, and a space behind the oropharynx that is prone to infection if compromised." She was not worried in J.G.'s case, however, because "[h]e didn't look toxic to me, so I wasn't concerned about a perforation..." She administered ibuprofen and released him after he relaxed.

The next day J.G.'s parents visited Giti's Home Daycare to confront defendant. Defendant admitted that she had tried to feed J.G. with a metal fork, i.e., not a specialized children's fork. [Maria Dolores] Parra Valdez, defendant's assistant at the daycare facility, testified that she could not get J.G. to eat on the day of his injuries and that later she saw defendant trying to feed him. Defendant was squeezing or pinching his cheeks. The implement that Parra Valdez had used to try to feed J.G. was an adult fork similar to a salad fork.

**3. Other Testimony**

**a. M.T.'s Injuries in 2003**

The father of M.T. testified about injuries his daughter received while in defendant's care. On January 29, 2003, M.T. was almost two years old. Her mother picked her up at defendant's daycare business and took her immediately to a hospital. M.T. had one or more facial scratches and bruises. M.T.'s father confronted defendant, and he testified that his best recollection of her explanation for the injuries was that M.T. had become scratched while playing with another child and bruised when "she went to the bathroom...and she slipped and hit her side of the face...on the sink or on the floor." Hospital personnel advised M.T.'s parents that they were going to report her injuries to the child welfare authorities…

**b. Expert Testimony Opining That Child Abuse Occurred**

Catherine Albin, M.D., a pediatrician and chief of her medical group's pediatrics

3

department, testified as an expert in diagnosing child abuse and spiral fractures. She reviewed the cases of G.M., J.G., and M.T.

Dr. Albin first testified about G.M.'s injury. G.M. was not ambulatory, and for such a child a spiral fracture is "considered to be decidedly unusual." She opined that his injury must have occurred while he was in defendant's care. It would be unlikely for G.M. to arrive at the daycare center, "go about his usual activities for a number of hours[,] and then suddenly ... start responding differently from an injury that would have occurred many hours earlier." She also opined that defendant knew or should have been aware that something was wrong with G.M. "[I]n general, there is not a period of time where a child would be expected to be without symptoms. So...shortly after the fracture, there would be a change in behavior and demeanor...so that someone who is experienced with his personality would identify something that was different."

Dr. Albin did not know how G.M. came to be injured; she opined only that "it requires a significant amount of force" to inflict the type of injury he suffered. She rejected the idea that such an injury could have been caused by another child's act of pushing him. "[A] child in a sitting position who is pushed backwards would potentially fall back, but there is no twisting in that mechanism of injury. There is no way ... I can identify that this child, by falling from a sitting position down to the ground, would injure his leg in this way."

Dr. Albin rejected the explanation defendant gave to G.M.'s parents:

"So my conclusion for abuse was based on serious injury to the largest long bone in the body, an explanation that, by an experienced childcare provider, seemed implausible, [and] there was delay in ... identifying that the child was injured. In fact, the child was carried around for a number of hours, and then the parent was not told about anything particular except for potentially the head injury. But the third aspect, which you didn't ask me about, which is important in my assessment, is that in the same packet with the case about G.M. were other injuries to children in the same daycare. So oftentimes, when I get cases of suspected child abuse related to a spiral fracture, when I ask Social Services to do an investigation of a family's profile, are there previous child abuse referrals? Are there other unexplained injuries? Does the child himself have previous injuries? So in this particular case, I had an unusual injury, an explanation that did not help me understand how the injury occurred, delay in seeking medical care, and then the third part was that...other children in the same home...had had injuries, which, in my opinion, were likewise consistent with abuse."

Later in her testimony, Dr. Albin reemphasized the importance to her of the allegation that a series of suspicious injuries occurred at Giti's Home Daycare. "In G.M.'s case, he is invaluable for the other two cases I reviewed [J.G. and M.T.] at the same time because this is a case where, in the daycare setting, other children were also injured. Even if G.M. had never been injured before, he is, in fact, following the continuum of being in the care of somebody who has injured other children."

4

Dr. Albin opined that G.M.'s injury was "nonaccidental" because it "meets all the criteria that's in the child abuse literature. Basically, a serious injury, implausible story, known trauma that has occurred...in that daycare setting, and delay of medical care." Also, defendant would have heard the bone break if it broke in her presence. Dr. Albin described herself as being "very assured that this is, in fact, an abuse-related injury," one that another child could not have caused.

As for J.G., Dr. Albin opined that defendant had held him immobile and force-fed him with a metal fork. She observed in photographs a pattern of minor scratch marks on his face that could have been caused by a fork of that type. She opined that the marks suggested an instance of "excessively forceful feeding that results in injury." As for the throat injury, the documentation Dr. Albin reviewed, which included the treating pediatrician's report and photographs, suggested "significant trauma to that area." A sufficiently severe injury in the back of the throat could be fatal because the resulting swelling could make breathing impossible. "A daycare provider who has years of childcare experience should know better." She viewed defendant as "a care provider who is extremely frustrated [and] who is out to teach this boy a lesson."

Dr. Albin also reviewed documentation concerning M.T., who allegedly was injured at the daycare facility in 2003. A photograph showed a bruise on her face and neck. There were "parallel markings that...don't match too many things in nature" and red and purple discoloration. The bruise was "very typical of a slap mark, and...it might be two separate impacts with a hand on the side of the face." Another photograph showed marks consistent with slap marks on the other side of her face. Still another photograph showed a scratch below an eye. M.T. probably had been scratched at the same time she was slapped.

"This is not accidental," Dr. Albin concluded. "There's no way that this child fell against anything symmetrically on both cheeks at the same time on the same day resulting in this...This is, in my opinion, an unrestrained slap that causes bruises...This child was hit twice, at least, and hit hard."

On cross-examination, defense counsel caused Dr. Albin to concede that her conclusions were based on limited information. His cross-examination implied that her work was cursory. Specifically, Dr. Albin testified that she had not consulted the pediatrician who treated J.G. She "[p]robably" looked at the pediatrician's report. She did not review G.M.'s pediatric medical records, although recently she had "been given some ... things" about him. She did not review M.T.'s medical records even though it was possible that M.T. had been a patient at Dr. Albin's hospital. Nor did she talk with M.T.'s treating physician - she responded to counsel's question with a suggestion: "perhaps you could explain to me what I would be asking them for." She could not identify any medical literature to support her view that a spiral fracture of a femur would be accompanied by a loud snap and based her opinion that it would because certain parents, but not all of them, had told her they had heard a snap in that situation. G.M.'s X-rays showed a possibility of older injuries - an arm injury and a leg injury - and if the X-rays did show injuries, they could have been inflicted by the same kind of torqueing force that likely caused his spiral femur fracture. Dr.

5

Albin could not recite the American Medical Association's or the California Medical Association's definitions of child abuse and was not sure that they had adopted one. She did not know the legal definition of child abuse. Defense counsel elicited inconsistent statements about whether Dr. Albin agreed that the examining pediatrician should be viewed as the expert in J.G.'s case rather than a physician reviewing the child's injuries. Dr. Albin backed away from an aspect of her testimony on direct examination and agreed that the injuries only were consistent with M.T.'s having been slapped.

Also on cross-examination, Dr. Albin testified that she had testified "[h]undreds of times" for the prosecution in child abuse cases in the past 20 years and continued to do so "[p]robably once a month."

[…]

**B. Defense Case**

Several character witnesses, all of them parents and clients of Giti's Home Daycare, provided glowing accounts of defendant's loving qualities. One witness was a pediatric nurse practitioner. The witnesses testified that defendant loved children and would never commit any reckless or negligent act that would harm a child. "I thought she was the most loving person I'd seen around children," one parent testified. Another parent, a pilates instructor, testified that defendant attended her young daughter's birthday party at her and her husband's home.

[…]

**C. Motion for a New Trial**

After the jury returned its verdicts, defendant filed a motion to substitute counsel, which the trial court granted. Thereafter defendant's new counsel (hereafter "replacement counsel") prepared a detailed and comprehensive motion for new trial based on a claim that defendant's original counsel (hereafter "trial counsel") provided constitutionally ineffective assistance under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution. A hearing followed in which replacement counsel strove to show, in effect, that because of trial counsel's omissions the trial was unbalanced and resulted in a miscarriage of justice.

Declarations attached to defendant's new-trial motion came from an attorney and a physician who questioned aspects of trial counsel's handling of the defense case.

The attorney, an experienced criminal defense attorney who is a certified specialist in the field, declared that "[i]n a case involving child abuse and child endangerment charges, it is very important to get all the facts and expert opinions so the jury can make an informed decision. Medical knowledge is constantly expanding and older theories are replaced by more research. Experts are necessary to permit the attorney to understand all the issues...They can also be called to testify to rebut or contradict...and raise a reasonable doubt…I am of the

6

opinion that [trial counsel's] representation was below the reasonably expected level of effective attorney assistance in the areas of investigation, preparation and presentation of evidence to the jury in a case, such as this one, in which the prosecution relies in large part on the testimony of a medical expert witness."

The physician, a pediatrician with a distinguished professional background, declared that the pediatrician who testified for the prosecution, Dr. Albin, had misinterpreted M.T.'s injuries and had incorrectly testified that G.M.'s injuries had to have occurred within 48 hours of their discovery by radiological methods. They could have occurred as much as four days earlier and possibly earlier than that. Moreover, G.M.'s X-rays, though consistent with normal variances in bone formation, also suggested a possibility of prior trauma, raising a question about the source of any such prior trauma, be it other accidents, other child abuse, or a rare disorder. With regard to M.T. and G.M., the declaration concluded, the prosecution expert's testimony was "exaggerated," "incorrect," "inconsistent," and ultimately "unreliable." Much the same was true regarding J.G. - the testimony was "overstated," "exaggerated," and again "unreliable." J.G's injury could have been self-inflicted and the medical expert's testimony that he was immobilized and force-fed lacked "any medical basis." The record suggested that the pediatric expert witness functioned "more as an advocate rather than an unbiased medical witness."

At a hearing on the motion, trial counsel was called as the prosecution's witness, i.e., a witness in opposition to the new-trial motion replacement counsel brought on defendant's behalf. Trial counsel was then cross-examined by replacement counsel. His testimony was lengthy and involved.

Trial counsel acknowledged that he did not consult a physician for information that might be introduced in evidence to counter the testimony of Dr. Albin. He called this a tactical choice and resolutely defended it and a number of other tactical choices that he made in representing defendant. Although he did retain medical experts on a criminal defendant's behalf when he thought it necessary, he had defended innumerable child physical abuse cases and had won some of them without calling a medical expert. He had learned that colleagues had presented expert medical testimony to counter Dr. Albin in other cases and had lost every time.

Trial counsel further testified as follows:

1. Trial counsel accumulated a wealth of information about Dr. Albin through various sources, had tried at least one case before this one in which she testified for the prosecution, obtained a good result in that case (acquittal on one count and a deadlocked jury on the other), and could anticipate her testimony in this case through the preliminary examination. He thought she would come across as a crusader for the prosecution and that cross-examination would show she was ill-informed about the facts of the case and certain medical phenomena. For example, based on trial counsel's reading of medical literature about pediatric spiral fractures and his anticipation that Dr. Albin would testify that the perpetrator would have to hear a loud crack when it happened, trial counsel knew

he could impeach her on the point himself and did not need an expert to do it. On cross-examination, "I said[,] Dr. Albin, can you point me to one medical book that says that this injury is accompanied by a loud sound? No, I can't. Can you give me one article that says that. No, I can't. One treatise? No. I can't." As a result, "I thought Dr. Albin looked like a fool" on that point, based on the loud-sound testimony counsel anticipated Dr. Albin would provide. Yet more problematic for Dr. Albin's testimony on that topic, trial counsel elicited the concession from her that G.M.'s X-rays raised the possibility of older traumatic injuries. Trial counsel did not need an expert to adduce this exculpatory evidence because Dr. Albin provided it herself.

2. To call a defense expert to testify could generate cynicism among the jurors because instead of highlighting the flaws in Dr. Albin's testimony the contest would be reduced to a battle of compensated experts.

3. The defense had a problem inasmuch as certain factual aspects of the case did not favor defendant. A defense medical expert could pick away at details of Dr. Albin's testimony, but on cross-examination the prosecution could further parade before the jury facts unfavorable to the defense.

4. To call a defense expert ran the risk that M.T.'s medical records would be brought to light before the jury, and that would harm the defense. "[T]hat expert was going to be asked about the other two kids [M.T. and presumably J.G.], and there were some real problems..." One problem was that the medical records would reveal that the treating physician had reported to the child welfare authorities that M.T. had suffered child abuse. By contrast, trial counsel knew that Dr. Albin had not reviewed M.T.'s medical records or talked to her treating physician and he could point out these lapses on cross-examination. By not bringing in an expert who could be questioned about M.T., trial counsel was able to keep that damaging evidence from the jury. [Footnote omitted.]

In general, trial counsel did not favor what he derided as the shotgun approach to trying a case. "[T]here are lawyers, you know, and I don't criticize anybody - there are lawyers who do what I call the shotgun approach, and they stand up and they want to fire a shotgun and pellets. Go…all over maybe this, maybe that. I never thought that was an effective way...to try a case." Because no competent potential witness had seen G.M. be injured while in defendant's care and the case against defendant with regard to G.M. was circumstantial, trial counsel preferred to try to focus the case so as to plant reasonable doubt in the jurors' minds regarding G.M. using methods other than the so-called shotgun approach.

The trial court denied defendant's new-trial motion. The court reasoned that Dr. Albin's testimony on the prosecution's behalf could effectively be countered either by a defense medical expert or, as trial counsel chose, by cross-examination. The court [found that] trial counsel "may very well have made the best tactical choices given the facts and circumstances that he had."

The California Court of Appeal affirmed. *Id.* at \*8-10. In upholding the trial court's ruling

8

that trial counsel's performance was not constitutionally deficient, the Court of Appeal highlighted that "compared to trial counsel's meticulous cross-examination, the additional criticisms of Dr. Albin's testimony offered in the pediatrician's declaration in support of defendant's new-trial motion amounted to little that would have assisted defendant." *Id.* at *9. The Court of Appeal also noted that even if trial counsel's performance had been deficient, defendant would not be able to show she was prejudiced given the overall strength of the evidence against her. *Id.* at *10.

## LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court may not grant the petition with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d).

As used in subsection (1), "contrary to" and "unreasonable application of" have different meanings. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000). A federal habeas court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions "but unreasonably applie[d] it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002). The focus of the unreasonable application inquiry is on "whether the state court's application of clearly established federal law is objectively unreasonable, and … an unreasonable application is different

1  from an incorrect one." *Id.*  "[E]ven a strong case for relief does not mean the state court's
2  contrary conclusion was unreasonable." *Harrington v. Richter*, 131 S. Ct. 780, 786 (2011).  A
3  claim for habeas relief from a state prisoner should be denied on the merits "so long as fairminded
4  jurists could disagree" on the correctness of the state court's decision." *Id.* at 786.

## DISCUSSION

The Sixth Amendment to the United States Constitution guarantees not just assistance of counsel, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). A petitioner must show two things to prevail on a Sixth Amendment ineffective assistance of counsel claim. *Id.* at 687. First, she must show counsel's performance was deficient, meaning that it fell below an "objective standard of reasonableness" as measured by "prevailing professional norms." *Id.* at 687-88. Second, she must show she was prejudiced by the deficient performance, meaning that "there is a reasonable probability that, but for counsel's … errors, the result of the proceeding would have been different. A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding." *Id.* at 694. The *Strickland* framework for analyzing ineffective of counsel claims is considered "clearly established Federal law, as determined by the Supreme Court of the United States," within the meaning of 28 U.S.C. § 2254(d). *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011).

Under AEDPA's deferential standard of review, the key question in analyzing an ineffective assistance of counsel claim brought by a state prisoner is whether the state court's application of *Strickland* was unreasonable. *Harrington*, 131 S. Ct. at 785. "This is different from asking whether defense counsel's performance fell below *Strickland*'s standard…A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* AEDPA requires a "doubly deferential" review of a state prisoner's ineffective assistance of counsel claim. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1410-11 (2011) (citation omitted). The federal habeas court must show deference both to the state court which previously reviewed the petitioner's claim, and also to trial counsel herself. *See id.*; *Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential."). Under 28 U.S.C. § 2254(d), "the question is not whether counsel's actions were

10

1    reasonable. The question is whether there is any reasonable argument that counsel satisfied
2    *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

3          Karimpour argues that her trial counsel provided constitutionally ineffective assistance by
4    failing to either consult with a medical expert or call one to testify at trial, and that the California
5    Court of Appeal unreasonably applied clearly established federal law when it held the trial
6    counsel's performance was neither deficient nor prejudicial. Redacted Petition at 1. This
7    argument does not overcome the "doubly deferential" standard that I must apply to this case.
8    *Cullen*, 131 S. Ct. 1388, 1410-11. Although Karimpour's attorney did not consult or call a
9    medical expert, he made a thorough investigation of the prosecution's expert witness, Dr. Albin,
10   and her likely testimony. *See Karimpour*, 2010 WL 2768934 at *6-7. Karimpour's attorney
11   "accumulated a wealth of information about Dr. Albin through various sources, had tried at least
12   one case before this one in which she testified for the prosecution, obtained a good result in that
13   case (acquittal on one count and a deadlocked jury on the other), and could anticipate her
14   testimony in this case through the preliminary examination." *Id.* at *7. Further, Karimpour's trial
15   counsel was an experienced criminal attorney who had previously defended "innumerable" child
16   abuse cases, winning some of them without the help of a medical expert. *Id.* at *6. His decision
17   not to consult a medical expert in this case was based on his informed calculation that reliance on
18   a medical expert risked harming Karimpour's case more than helping it. *Id.* at *6-7. *Strickland*
19   permits defense counsel to make reasonable decisions that make particular investigations
20   unnecessary, 466 U.S. at 691, and the Supreme Court has made clear that attorneys are rarely
21   required to obtain expert assistance where other effective means of advocacy, such as cross-
22   examination, are available. *See Harrington*, 131 S. Ct. at 788-91. On this record, I cannot
23   conclude that "there is [no] reasonable argument that [Karimpour's attorney] satisfied *Strickland*'s
24   deferential standard." *Harrington*, 131 S. Ct. at 788.

25         Karimpour contends that *Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008), supports her
26   argument that her trial counsel's failure to consult with or call to testify a medical expert
27   constituted deficient performance under *Strickland*. *See* Redacted Petition at 39-40. In *Duncan*, a
28   capital case, the Ninth Circuit held that Duncan's attorney provided inadequate assistance by

11

failing to obtain a serology expert to test Duncan's blood and present the results at trial. 528 F.3d at 1235-39. Had Duncan's attorney done so, the jury would have learned there was a third-party's blood at the scene of the crime, other than Duncan's and the victim's. *Id.* at 1240-41. The Ninth Circuit concluded that this evidence would have raised considerable doubt as to whether Duncan himself killed the victim, and that, as a result, Duncan might have escaped the death penalty. *Id.* In ruling for Duncan, the Ninth Circuit observed: "Although it may not be necessary in every instance to consult with or present the testimony of an expert, when the prosecutor's expert witness testifies about pivotal evidence or directly contradicts the defense theory, defense counsel's failure to present expert testimony on that matter may constitute deficient performance." *Id.* at 1235.

There are critical differences between *Duncan* and the instant case. Duncan's attorney was demonstrably ill-informed about the field of serology. *Id.* at 1236. At the outset of his cross-examination of the government's serology expert, Duncan's attorney told the expert, "You lost me." *Id.* at 1235. Duncan's attorney proceeded to ask the expert about hair evidence, though serology involves the study of blood. *Id.* at 1235-36. The Ninth Circuit concluded that Duncan's attorney "did not have the personal expertise in serology to make strategic decisions about how to handle the blood evidence on his own and he certainly was not qualified to undermine the State's case by simply cross-examining its experts without obtaining expert assistance himself." *Id.* at 1236.

In contrast, based on his experience and his thorough research of Dr. Albin and her likely testimony, Karimpour's attorney was able to effectively cross-examine the doctor without the help of a defense expert. *See Karimpour*, 2010 WL 2768934 at *4-5. Karimpour's attorney "caused Dr. Albin to concede that her conclusions were based on limited information." *Id.* at *4. He elicited that Dr. Albin had not consulted the pediatrician who treated J.G., had not reviewed G. M.'s medical records, and had not spoken with M.T.'s treating physician or reviewed her medical records. *Id.* Dr. Albin also admitted on cross-examination that she could not identify any medical literature supporting her testimony that a spiral fracture would be accompanied by a loud snap, and that G.M.'s X-rays revealed a possibility of older injuries. *Id.* The Court of Appeal concluded that Karimpour's attorney's "meticulous cross-examination" of Dr. Albin presented the jury with

12

information very similar to that which would have been presented by a defense expert. *Id.* at *9. Unlike the attorney in *Duncan*, the record here indicates that Karimpour's attorney was capable of "undermin[ing] the State's case by simply cross-examining its exper[t] without obtaining expert assistance himself." 528 F.3d at 1236; *see also Harrington*, 131 S. Ct. at 791("In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict.").

Further, the habeas petition at issue in *Duncan* was filed prior to AEDPA's passage and was not governed by the Act. 528 F.3d at 1232-33. The Ninth Circuit applied de novo review to Duncan's ineffective assistance claim. *Id.* at 1233. Karimpour's ineffective assistance claim, on the other hand, is not subject to de novo review. The question in this case is not whether the state Court of Appeal's ineffective assistance analysis was incorrect, but whether Karimpour has shown that the Court of Appeal's determination that her attorney performed adequately was "objectively unreasonable." *Bell*, 535 U.S. at 694. Karimpour's reliance on *Duncan* is not sufficient to carry this heavy burden.

Karimpour cites a number of other cases in which an attorney's failure to obtain expert advice constituted ineffective assistance of counsel. *See, e.g.,* Redacted Petition at 40, 44, 47; Traverse at 18-20. Each of these cases is distinguishable from Karimpour's case, whether because in the other cases the attorney was particularly inexperienced in the applicable field, the attorney's investigation of the matter was particularly superficial, or the case was not governed by AEDPA's deferential standard of review. *See, e.g., Showers v. Beard*, 635 F.3d 625, 632 (3d Cir. 2011) (emphasizing attorney's failure to "understand key, undisputed facts in the record); *Elmore v. Ozmint*, 661 F.3d 783, 861 (4th Cir. 2011) (attorneys "conducted no more examination of the forensic evidence than to ask a day or two before…trial to see the exhibits that the State intended to introduce"); *Dugas v. Coplan*, 428 F.3d 317, 329-30 (1st Cir. 2005) (attorney "acknowledged that he lacked any knowledge of arson investigation and had never tried an arson case"); *Gersten v. Senkowski*, 426 F.3d 588, 609-10 (2d Cir. 2005) (attorney decided not to consult an expert "without having first conducted any investigation whatsoever into the possibility of challenging

13

the prosecution's medical or psychological evidence"); *Holsomback v. White*, 133 F.3d 1382, 1385-89 (11th Cir. 1998) (applying de novo review); *Miller v. Senkowski*, 268 F. Supp. 2d 296, 311-12 (E.D.N.Y. 2003) (emphasizing attorney's "lack of education and knowledge").

The decision not to retain a medical expert might not have been the wisest choice, but Karimpour's attorney demonstrated substantially more skill, knowledge, and diligence than the attorneys described in the cases Karimpour cites. "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 131 S. Ct. at 791. There is no per se rule requiring a lawyer to consult with a medical expert, particularly in the circumstances of this case, where the lawyer was experienced and had thoroughly investigated the qualifications and likely testimony of the opposing medical expert. Whether counsel performs deficiently by failing to obtain expert assistance depends on the specific facts of the particular case. Based on the record in this case, it was not objectively unreasonable for the state court to hold that Karimpour's attorney performed adequately under *Strickland*.

Because I conclude that the Court of Appeal reasonably determined that Karimpour's attorney performed adequately, I do not consider whether Karimpour was prejudiced by the allegedly deficient performance. Absent the state court's unreasonable adjudication of both prongs of the ineffective assistance of counsel claim, Karimpour is not entitled to habeas relief.

## CONCLUSION

For the reasons discussed above, Karimpour's petition is DENIED. I will not issue a certificate of appealability. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). Karimpour may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED**.

Dated: August 27, 2014

WILLIAM H. ORRICK
United States District Judge